SUNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 23-CR-211 (JRT/LIB) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **RYAN THOMPSON'S** |
| | ) | **SENTENCING POSITION** |
| RYAN EDWARD THOMPSON, | ) | |
| | ) | |
| Defendant. | ) | |

Ryan Thompson's memories of his childhood are incomplete. His memories are part snapshots of what he believes he remembers and what others have told him. He has been told that his biological mother was a chronic drug user throughout her life. This included when she was pregnant with him. He stated that his family told him that upon his birth, he was "hooked up to machines." He was primarily raised in Clearwater County moving to Red Laker later in life. His biological parents were never together, that he remembers. His mother and maternal grandparents were his primary caretakers until age six when he lived with his father and stepmother, who would become one of the few positive influences in his life.

While living with his biological mother, Mr. Thompson remembers her chronic drug use and prostitution. She moved him and his older sister to Washington for some time. Mr. Thompson remembers that she did some horrible stuff. She would engage in prostitution and leave him and his sister alone for extended periods. She also, in his words, "sold us." He remembers that he and his sister were exchanged with men for drugs and money. He recalled being repeatedly "sold" to his mother's great uncle, who would gag him. When

1

"sold" to others, he remembers that he and his sister were both physically and sexually abused. At times, he and his sister were removed from his mother's care but always returned. They sometimes lived with their grandparents and others in foster care. During placement in foster care, he stated there were repeated instances of physical and sexual abuse as well. Once, he recalled being struck with bamboo sticks until his skin separated. Also, an older female cousin held him down, pulled down his pants and underwear, and would be sexual with him.

Around the age of six, Mr. Thompson's father was informed that he had a son. In Mr. Thompson's recollection, his father was unaware that he existed and was surprised by this information. A paternity test was conducted, and it was confirmed. Mr. Thompson stated that being taken from the foster home by his father was the "happiest day of my life." He went to live with his father and stepmother, whom he calls "mom." Separated from his sister he lived as an "only child" until an older step-sister came to live with them when he was around eight. They lived on the reservation in a trailer. His father worked full-time at a sawmill and had a landscaping/tree-trimming business. His mother was a supervisor at an industrial plant where ATV engines were manufactured. Both had stable employment, and basic needs were met. He described that once he met his father, "it was awesome." His mother's family also welcomed him with open arms.

Mr. Thompson's stepmother passed away about four years ago from cancer. This was a difficult loss for him as they had a close relationship. Talking about her still brings tears to his eyes.

Mr. Thompson considers himself impulsive. He purchases things he cannot afford

and has difficulty managing money. His children's mother is "strict" with finances, but he goes behind her back and purchase things he did not have growing up. He also gambles at the casino and bets on sports. At one point, a girlfriend had to bail him out of gambling debt and hid his keys so he would not drive to the casino.

Mr. Thompson hopes to resolve past issues and move forward. He is realistic that his future will be in custody, but he hopes someday to work and support his family in the community. Since being incarcerated, he has experienced loneliness, but video visits and phone calls have helped. He and his current partner have been together for eight years. She remains supportive of him, even with his current legal issues.

Mr. Thompson tells me, and I have witnessed, that his mood has been "like a roller coaster." He will cry when he speaks to his fiancé or children. His weight has fluctuated, and his sleep is erratic. He finds it difficult to get to and stay asleep. He tends to toss and turn at night. He has lost some interest in activities, has trouble concentrating, feels hopeless, and feels like a failure. He experiences anxiety, especially when he considers long-term incarceration. This can present as rapid breathing and a headache. This can occur multiple times per day. He calms himself by shaking his head and taking a shower.

Mr. Thompson is a broken man.  As a victim of abuse, he has spent his life using drugs and running from his past.  Incarceration and the programming that will go along with his sentence will make a difference in his life. Now following trial, this Court must determine what the appropriate length of sentence is for Mr. Thompson's conviction on two counts of production of child pornography based on two images taken several seconds apart. As the Court is aware, the offense involved one victim, was not carried out over a

prolonged period of time and did not involve distribution of the images. The PSR calculates Mr. Thompson's guideline range as 720 months. (PSR ¶ 77). Mr. Thompson submits that his properly calculated guideline range is 235-293 months. He requests that the Court impose a sentence of 15 years in custody—180 months.

## I. Objections to the PSR's Guideline calculations.

Mr. Thompson objects to the PSR's calculation that the total offense level is 43. (PSR ¶ 29). Specifically, he objects to the PSR's determination that five-level enhancement in U.S.S.G. § 4B1.5(b) for repeat and dangerous sex offenders against minors applies in this case. (PSR ¶ 27). The enhancement could only apply to Mr. Thompson if he had "engaged in a pattern of activity involving prohibited sexual conduct[.]" U.S.S.G. § 4B1.5(b). As the application notes clarify, a "pattern of activity" requires engaging in prohibited sexual conduct with a minor "on at least two separate occasions." U.S.S.G. § 4B1.5(b) cmt. app. nt. 4(B).

The PSR applies the enhancement to Mr. Thompson "[b]ased on the defendant's pattern of activity involving prohibited sexual conduct described in the Offense Conduct section of this report." (PSR ¶ 27). That activity appears to refer to (1) M.H.'s claim that Mr. Thompson sexually assaulted her multiple times when she was three years or four years old, (PSR ¶ 12); (2) M.H.'s claim that Mr. Thompson had been sexually assaulting her every day for a week, (PSR ¶ 10); or (3) the claim that a video taken on December 4, 2020, also constituted child pornography, (PSR ¶ 11). The enhancement should not apply based on any of these claims.

With regard to the claim that Mr. Thompson, sexually assaulted M.H. when she

4

was three or four years old, M.H.'s testimony at trial shows that this assertion is not credible. M.H. testified at trial that during the assaults two of her siblings—Landon and Ayasha—were present in the room with her. But as a nurse practitioner and forensic interviewer Shannon Shaw testified, the records created during the forensic interviews of the other children who lived at the house showed that Landon is five years younger than M.H. and thus not alive at the time of the alleged assault. As a result, the Court should not credit the claim of early childhood sexual assault and should not apply a five-level enhancement based on it.

Based on the testimony at trial, the Court also should not credit the claim that Mr. Thompson had been sexually assaulting M.H. every night in her bedroom for the week before December 4. This claim is not consistent with the other testimony and exhibits. M.H. testified that she had searched "why is my dad a pervert" on her school laptop after Mr. Thompson took her phones away and touched her thigh one evening. That search occurred on December 2, according to a school social worker of Fosten Middle School. And she testified that she reached out to M.H. by email on December 3 to ask about the search. M.H. did not report a series of sexual assaults to the social worker. She told the social worker that Mr. Thompson had touched her thigh, which did not prompt her—who is a mandatory reporter—to take any further action. M.H. also did not say she had been repeatedly assaulted when she reached out to the hotline on December 4, prompting the police to come to the house. Additionally, Michelle Reynolds testified that she believed M.H.'s phones were taken away from M.H. the night before Mystic reported. In light of these inconsistencies, the Court should not credit M.H.'s claim of a week of sexual assaults.

Finally, the December 4 video does not meet the definition of child pornography, because it is not sexually explicit conduct. *See* 18 U.S.C. § 2251(a). The term "sexually explicit conduct" refers to "actual or simulated" enumerated sex acts "or (v) lascivious exhibition of the anus, genitals, or pubic area of any person." 18 U.S.C. § 2256(2). The December 4 video pans up the body of a person who is under a blanket from a person's feet. In the video, the person is wearing shorts or underwear. The government claims the video shows the genitalia of the person, but even FBI Special Agent Nicole Lopez testified, you would have to watch the video in slow motion to see the pubic area of the person. If the person's genitals are visible, it is for less than a second of a 44 second video. Under Eighth Circuit law, "a depiction of a child is a lascivious exhibition of the genitals when 'the child is nude or partially clothed, when the focus of the depiction is the child's genitals or pubic area, and when the image is intended to elicit a sexual response in the view." *United States v. Rayl*, 270 F.3d 709, 714 (8th Cir. 2001) (quoting *United States v. Horn*, 187 F.3d 781, 789 (8th Cir. 1999)). Because the focus of the depiction is not the child's genitals, the video is not a lascivious exhibition of the genitals or child pornography, and it should not be considered an occurrence for the purposes of the pattern enhancement.

Because these three claims do not qualify as occurrences for the enhancement, there is only one occurrence—the December 3 pictures. One occurrence is not a pattern, so the enhancement does not apply. U.S.S.G. § 4B1.5(b) cmt. app. nt. 4(B). Removing the 5-level increase under § 4B1.5(b), Mr. Thompson's total offense level would be 38. As such, Mr. Thompson submits that his properly calculated guideline range, with an adjusted offense level of 38 and a criminal history category of I, would be 235 to 293 months.

> II. **Mr. Thompson has been in both Tribal and Federal custody related to this case. Pursuant to §5G1.3(b) he asks this Court to adjust his sentence to reflect his custody credit.**

On October 20, 2022, Mr. Thompson was arrested in Red Lake on the same conduct related to this case (he has remained in custody since his arrest). (PSR at F.1). On June 13, 2023, he made an initial appearance in Federal court. He was detained on June 16, 2023. As this Court knows, generally, when a defendant is serving a term of imprisonment at the time the instant offense is committed, any term of imprisonment imposed in the instant offense is to run consecutively. U.S.S.G. § 5G1.3(a). However, when the term of imprisonment being served has the same relevant conduct as the instant offense the Court "shall adjust" the term of the instant sentence to reflect credit for the previously served sentence. U.S.S.G. § 5G1.3(b)(1). All of Mr. Thompson's custody history, beginning with his arrest in Red Lake on October 20, 2022, is a result of conduct directly related to this case. He respectfully requests this Court adjust his sentence so that he may receive credit for the time he was in custody from October 20, 2022, until June 16, 2023, a period of 239 days.

> III. **A 15-year sentence accomplishes the goals of sentencing.**

Considering the 18 U.S.C. § 3553(a) factors—including the nature and circumstances of the offense; Mr. Thompson's history and characteristics; the need for the sentence to reflect just punishment, deterrence, and public safety; and avoiding unwarranted disparities—a 15-year sentence is "sufficient, but not greater than necessary, to" achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

### A. Mr. Thompson's history and characteristics

Mr. Thompson attended school at Bagley Elementary, where he was bullied due to being hard of hearing. He also reports he experienced racism. He attended an off-reservation school because of his father's concerns that he would associate with negative influences on the reservation. Unfortunately, Mr. Thompson still became involved in drugs and went the wrong way.

Mr. Thompson participated in Special Education throughout his academic career, which ended in the 10th or 11th grade. He told me his decision to leave school was due to a teacher who was racist. That a science teacher made a derogatory comment about "Indians." He informed his father and asked to be allowed to quit. His father agreed to a school change where he went to an alternative learning center. However, instead of attending classes, he would drink alcohol with his cousin. Today he has a goal to obtain his GED.

As for employment, Mr. Thompson worked with his father's landscaping business. He was also a volunteer firefighter and first responder for a few years in his early 20s. His drinking interfered with his jobs, so he bounced around. He worked at the local sawmill/lumber yard and his last job before his arrest at the Red Lake Trading Post.

Mr. Thompson has an extensive substance use history. He first used alcohol and methamphetamine at 13, acid and crack cocaine at 14, and marijuana, which he refers to as "medicine." He has also used opiates, including fentanyl patches, at the age of 15. With many of these substances, his use was daily over the years. He identified his drugs of choice as methamphetamine and marijuana. His current incarceration has been his most extended

8

period of sobriety.

Mr. Thompson hopes to put together a life of healthier habits in prison. He wants to receive treatment, including substance use treatment and mental health services, and he also wants to earn his GED to set his life on a new path when released.

### B. Punishment, deterrence, and avoiding unwarranted disparities in light of the nature and circumstances of the offense.

A 15-year sentence adequately punishes and deters Mr. Thompson, and it avoids unwarranted disparities in sentencing. Fifteen years would be, by far, the longest sentence ever imposed on Mr. Thompson. He had not spent two consecutive months in custody before this case. In fact, Mr. Thompson has only two prior adult convictions that led to jail time. One was a felony theft when he was 18 years old, for which he served a total of 45 days in jail, and the other was a misdemeanor conviction for disorderly conduct leading to 30 days in jail. (PSR ¶¶ 35-37).

As discussed above, this case involved an isolated course of conduct. There were not multiple victims. While it was a contact offense, it did not involve repeated sexual contact over months or years. And the offense did not involve distribution of images.

Recent sentences imposed in other child pornography cases involving similar and more culpable conduct in the District of Minnesota confirm that a 15-year sentence is sufficient but not greater than necessary to achieve the societal aims of sentencing in this case. For example,

- Jason Lee pled guilty to one count of attempted production and production of child pornography and was sentenced to 180 months concurrent with the time he would serve on a Wisconsin state case in case 23-cr-128 (DWF). (23-cr-128 Doc. 44 at 2). He admitted to recording himself touching a 4-year-

old's vagina with his hand. (23-cr-128 Doc. 27 at 2). Lee's guideline range was 168-210 months. (23-cr-128 Doc. 27 at 2, 5-6).

- Rachel Ann Raab pled guilty to one count of aiding and abetting production of child pornography and was sentenced to 180 months in case 22-cr-101 (KMM). (22-cr-101 Doc. 90 at 1-2). The minor victim, with whom Raab had a caretaking relationship, was under the age of 12, and the video showed Raab's hand rubbing lotion onto the victim's penis. Raab also distributed the video. (22-cr-101 Doc. 52 at 2, 5-6). Raab's guideline range was 262-327 months. (22-cr-101 Doc. 52 at 6).

- Gene Schave was convicted after trial of possessing child pornography and was sentenced to 150 months in case 20-cr-59 (ECT). (20-cr-59 Doc. 138 at 1-2). He had previously been convicted of a state sex offense, and while on probation for that offense, he admitted to sexually molesting seven minor girls. (20-cr-59 Doc. 125 at 2-4).

- David Barrett pled guilty to one count of attempted production of child pornography and was sentenced to 240 months in case 21-cr-39 (NEB). (21-cr-39 Doc. 52 at 1-2). He installed a hidden camera in a bathroom of his residence that he knew three minors would be using, and from 2017-2018, he captured naked images of all three of them. (21-cr-39 Doc. 27 at 6). Barrett also possessed an extensive collection of child pornography that involved children under the age of five being sexually assaulted, and he personally provided one of the minor victims of his production with alcohol and sexually assaulted her. Barrett's guideline range was 235-293 months. (21-cr-39 Doc. 27 at 6).

Similarly, sentences imposed in child pornography cases nationwide in the last five years show that a 15-year sentence would be sufficient but not greater than necessary in this case. For example:

- David Gfeller pled guilty to one count of production of child pornography and was sentenced to 180 months in case 19-cr-6205 in the Western District of New York. (Case Doc. 36 at 1-2). For more than two and a half years, he used a minor victim who was between 4 and 7 years old to produce and distributed child pornography, including Gfeller manipulating the minor's penis and then taking photos. (Case Doc. 22 at 4-5). His guideline range was 360-life. (Case Doc. 22 at 6-7).

10

- Jessica Barrington pled guilty to one count of production of child pornography and was sentenced to 240 months in case 19-cr-127 in the Eastern District of Washington. (Case Doc. 152 at 1-2). She produced and distributed images of her minor daughters, including performing oral sex on a 3-year-old, and she sent the images she produced to approximately ten men she met online. (Case Doc. 135 at 8). Her guideline range was life. (Case Doc. 135 at 12).

- Kaleb Scott pled guilty to one count of production of child pornography and was sentenced to 252 months in case 22-cr-5256 in the Western District of Washington. (Case Doc. 44 at 1-2). He took and distributed pictures of himself touching an infant child in his care with his penis and of himself penetrating the buttocks of the same minor. (Case Doc. 26 at 5-6). His guideline range was life. (Case Doc. 38 at 3).

- Selina Duflo pled guilty to one count of child pornography and was sentenced to 240 months in case 21-cr-153 in the District of Oregon. (Case Doc. 49 at 2). For more than a year, she sexually abused a 6-year-old in her care and distributed the videos of the abuse. (Case Doc. 42 at 3). Her guideline range was 360-life. (Case Doc. 41 at 3).

- John Holcomb pled guilty to one count of production of child pornography and was sentenced to 240 months in case 21-cr-75 in the Western District of Washington. (Case Doc. 116 at 1-2). He did not reach a plea agreement until after the government had already submitted its witness list and exhibit list for trial. (*See* Case Docs. 89, 90, and 95). For six years, Holcomb used a child he had access to to take produce child pornography, including images of him touching the minor victim's vagina and penetrating her vagina. (Case Doc. 95 at 6-7). His guideline range was life. (Case Doc. 111 at 2).

As these cases demonstrate, a below guidelines sentence of 15 years is appropriate in Mr. Thompson's case which involved a single victim in an isolated incident that did not involve distribution.

## CONCLUSION

In light of the circumstances of the offense, Mr. Thompson's history and characteristics, and the sentences imposed in both similar and longer running child pornography offenses in the District of Minnesota and nationwide, Mr. Thompson requests that the Court impose a sentence of 15 years.

Dated:  June 25, 2024            Respectfully submitted,

*s/ Aaron Morrison*

AARON MORRISON
Attorney ID No. 0341241
DAN HUDDLESTON
Attorney ID No. 1031856FL
Attorneys for Mr. Thompson
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415